309-1038, Empress Sinaloa Corporation et al. Appellees by Edward White versus Alexi Generius et al. Appellants by Richard Hussack. Okay, is the appellants count ready? Yes, Mr. Chairman. May it please the court, before I begin, I'd just like to mention that there is a preliminary business matter. Opposing counsel has brought some demonstrative exhibits. He's shown them to me and I'm not comfortable with them in light of the contents. And if you wish me to address that, I'd be glad to do so. But otherwise, however the court wants to proceed with those. I guess I'm not aware of exactly what you're raising. He has some chart boards here that he brought up that contain excerpts of some of the statutory language and some additional argument. And my concern is that the excerpts seem to have been selectively chosen to omit unhelpful language to their position, to emphasize helpful language to their position. The statutes are fully quoted in the appendix to our brief. But it's reference to the statute, and he's making an argument, correct? If the court has no objection, I just wanted to point out that I have that concern. Okay, so. Well, I think I'd probably like you to make an objection when they're presented, and the basis of that objection, and then we'll make a decision at that point. Okay, and I didn't want to interrupt his argument. Show him the courtesy to show them to me, and I explain to him my concerns. So, again, may it please the court, I'm Assistant Attorney General Richard Hussack, counsel for the state treasurer in the Illinois Racing Board. With respect to the circuit court's order awarding interest to the Horse Racing Equity Trust Fund, based upon the circuit court's interpretation of two statutes, and it's the state's position in this case, that the circuit court erred in its interpretation of both of those statutes, and that its order awarding interest should be reversed. Quickly, by way of background, the issue that's present before the court in this appeal arose after the full adjudication of the merits of the underlying litigation in which the casinos that were ordered to pay surcharges into this racing fund, the horse racing fund, I'll refer to it as, finally lost in front of the Illinois Supreme Court. Their request for review of the US Supreme Court was denied, and on remand, the circuit court then ordered the monies that the casinos had put into a protest money fund, consistent with the Protest Monies Act, distributed to the horse racing fund, pursuant to the 2006 act that was the subject of that litigation for subsequent redistribution to the racetracks to be used in accordance with the 2006 act. After all of that, the racetracks then also asked for an award of interest on the approximately $76 million that had been held in the protest fund during the course of that litigation. And they argued that that interest award to the horse racing fund was required under two statutes, the 2006 act itself and the protest monies fund act. The circuit court agreed with both reasons and ordered the payment of interest on that approximately $76 million for the entire time it was in the protest monies fund into the horse racing fund. So it's the state's position again, simply to reiterate, that the circuit court misinterpreted both of those two statutes on which it relied in ordering interest. Before I get into each of the two statutes, I would like to make three- In your argument, basically you're saying the interest goes to the winner. Well, the state was the winner too, as the defendant. But yes, I mean, the state essentially would keep any interest that was earned on the protest monies while they were in that fund, absent a statutory basis, to support an award of interest into the horse racing fund. So the question here, and I think it gets sometimes a little clouded in the briefs, is not what the legislature would have done if it specifically anticipated this situation that arose, where what was supposed to be a prompt distribution of the surcharges into the horse racing fund and then out to the racetracks was delayed by several years of litigation. The question isn't what they would have done if they'd anticipated. The question is, do either of the statutes that the circuit court relied on specifically provide for the payment of interest by the state into the horse racing fund in that circumstance? And one of the points that I'd like to make as a preliminary matter is that there's really no dispute that these were public funds. The racetracks have repeatedly emphasized that all of these surcharges, until they were delivered to the racetracks out of the horse racing fund, which is now finally been accomplished. All of those surcharges were public funds. They were not private money. And I think to emphasize the point, I would submit that if the legislature, before that distribution had made, passed a law saying, we made a mistake as a policy matter. We're now passing a new law that says all that money should go back to the casinos. That would be perfectly constitutional, that there was no vested ownership, private property right in those funds by the racetracks until they were put into the racetracks' hands. They've insisted all throughout the underlying litigation. They've insisted in their brief in this case, at page 16, that these were public funds. So it's really a horse of a different color than most of the cases that come along involving disputes under the Protest Monies Act, which are involving either the plaintiff taxpayer who pays money that the taxpayer owns and has a property interest into a protest fund and wins. And we agree that the statute provides for the payment of interest back to the plaintiff taxpayer in those cases. Or the separate situations listed in the Protest Monies Act, where the taxing body under one of the listed statutes is a local governmental body, typically a municipality or a county or the like, and the state is simply a collecting agent and takes a nominal administrative fee for processing the tax payments, but the money at all times is levied pursuant to the local taxing body's authority. It's their money at all times, and in that case the Protest Monies Act also provides for if the plaintiff loses in that case. Another preliminary point that I'd like to emphasize here is that there's no dispute that the General Assembly wanted these monies to go to the racetracks quickly. The legislative findings were that casino gambling had harmed the racetrack and horse breeding industry in Illinois, and that it was an appropriate exercise of their legislative authority to require these casinos or the highest earning ones to pay these 3% surcharges for two years for that money to be deposited daily into the horse racing fund administered by the racing board. And then within ten days to go out to the racetracks to be used as the statute specified. So there's no dispute that the legislature wanted the money to go to the racetracks quickly.  My question is, what did the legislature specifically provide, if anything, for this unusual situation in which that didn't happen? Did they provide that the state should compensate the racetracks for the lost time value of money in a situation where casinos brought litigation and tied up those monies for several years? We have to admit that this statute is not a model of our partisanship in drafting the statute, correct? Both of them, or? Well, certainly the act that gives the money disposition act that says in one sentence, if any authorized payment from the protest fund shall bear simple interest at a rate of yada, yada, yada. And then if it stopped right there, I mean, that's pretty clear, right? But then they go back. I agree. We concede. And then in one sentence. I had a lawyer in my office, you know, castigate me for putting in my brief that we concede that this statute is ambiguous. And I said, but that's the only possible legal conclusion. The question, the other side says it's not ambiguous. They say it's unambiguous in their favor that that language, which I say is improperly viewed in isolation, always requires the payment of interest in every protest money in that case. And as I point out, there's some serious problems with the argument that it's unambiguous and that the only reasonable interpretation is that one advanced by the racetracks in this case, because primarily it disregards the immediately following sentence of that statute that says when the plaintiff, who taxpayer or person who pays into the protest fund fails, then interest shall be paid, but only if the payment was made in protest of one of these following statutes. So when you look at that isolated provision, any authorized payment, along with this other section or the following sentence that says when the plaintiff paid or fails, then there shall be payment of interest only in certain enumerated situations. You look at them together, and I think you're right. It's not a model of drafting clarity. Our position is that it creates an ambiguity. The statute can be reasonably read in more than one way. And if that's true, it's still a question of law for the court to resolve using the normal canons and tools of interpretation at its disposal. And those include, I think most importantly, that you can't read out of the statute that second clause as mere surplusage if it can be given effect, which it certainly can. And likewise, the enumeration of specific local tax statutes where interest is payable to the local taxing body if the plaintiff fails indicates by the canon of interpretation that the enumeration of some things implies the exclusion of others, that in other cases where the plaintiff fails, that interest is not payable. And that's essentially what our position is, that these provisions of the statute read together are properly interpreted, although ambiguous, are properly interpreted to mean that if the plaintiff pays and wins and gets his money back, he gets interest at the statutory rate. And if the plaintiff loses, interest is payable to a municipal taxing body whose tax was protested in the case if the payment is made in connection with one of those specific local taxes. But if the plaintiff loses and it's not in protest of one of those statutes, and that's our case, then there is no statutory provision for the payment of interest. And the final main point that we've advanced here is that the racetrack's suggested interpretation of the statute really presents an absurdity, and that is the type of thing that statutes should not be read to embody because under their reading in the run-of-the-mill garden variety protest monies case where somebody protests taxes assessed by the state of Illinois, state income tax, for example, and loses, then the state treasurer has to figure out interest from the protest monies fund, which is state funds, to pay to the state department of revenue or general revenue fund. And that doesn't make any sense, and even the racetracks in this case admit that interpreting the statute to be as broad as they say it must be creates this absurdity, which is also something that should be avoided. So we submit that with respect to the protest monies act itself, there is this ambiguity, and the better interpretation just from the face of the statute itself is that in this unusual situation where the plaintiff files a protest monies case and loses, and it's not one of these specific local taxing statutes that protested, then there is no provision in the statute for the payment by the state of interest. That interpretation significantly is confirmed by the legislative history, and I've copied the relevant passages in the appendix to my brief, and it makes it clear that both with respect to the amendment of the protest monies act for the first time by the legislature, when they added that first section and then in the immediately following session of the legislature, or maybe it was the same session but in the following year, when they added the provision about local taxing statutes, each time they made it clear that the first provision was intended to cover only situations in which the plaintiff taxpayer put money into the fund and prevailed in the protest case. And I think it's important when there is an ambiguity for the court to consult the legislative history, and in this case, it unequivocally and uniformly supports the interpretation adopted by the state in this case. So it's not a model of drafting clarity. I absolutely concede that, and we submit that unfortunately some statutes could be better written, and there's no doubt that this one could be better written, but that when the court goes through the entire process of looking at the various, the language of the statute in its entirety, does not exclude any of it as surplusage, doesn't give it an absurd meaning, treats the listing with specific examples of when there's a payment of interest when the plaintiff fails, and it treats that as being an exhaustive enumeration, that all of those factors contribute to the interpretation, which is not the one the circuit court adopted in this case. And again, let me then turn to, very briefly, I think the other statute on which the circuit court relied, which is the 2006 Act itself, and that is all of subsections A and B are included in the appendix at pages 3 and 4. And what I have to say is that if you read sections A and B together, it is clear that the horse racing fund is not like other state funds. It's a segregated trust fund. It's not commingled with other state money. So interest in that fund naturally consists of interest on money that's already in the fund, because it's under the control of the racing board. The racing board doesn't have to go elsewhere to some other fund to find interest to make an award as the circuit court ordered in this case. Section A further says that money in the fund shall be distributed in accordance with subsection B, which again explains that whatever subsection B provides for the distribution of principal and interest consists of monies in the fund subject to the racing board's administration, not monies in some other location. Those provisions fit perfectly together, along with a clear language of subsection B that describes the interest that's payable from the fund to the race tracks, which is the relevant language is that the monies deposited into the fund plus any accrued interest on those monies shall be paid to the race tracks. Interest on those monies. Those monies refer to the immediately preceding phrase monies deposited into the fund because everything distributed out of the fund has to be in the fund subject to the racing board's administration. But what the circuit court did here is say we'll take money that's not in the fund in order to pay it into the fund. We're not going to take money that's in the fund in order to pay it out of the fund. It doesn't make any sense. For those reasons, I urge the courts to reverse the circuit court's decision with respect to its interpretation of both statutes. Thank you, Your Honor. Thank you, Counselor. Counselor, you may proceed. There's no way I can do this. If the court please, following along with the counsel's earlier remark, what we have done is prepared two boards which simply highlight the real language that we're concerned about interpreting here. I don't want to pursue my objection further. I maintain it, but what I would ask the subject of the court's ruling or preserving ruling or whatever it wants to do is that the board be positioned so that I can see it sitting at counsel table. You have the same language in the appendix to your brief, and if I twist it, one of the judges is not going to be able to see it. What you might be able to do is move it back. I don't think you can see it from there. I can't see it there. You forgot that we're old. You made that. I'm going to be waiting. It's all right. I can see it. Can you see it? Counselor, you can just move over to it. I think I don't like it. Do you have any objection? We have pleased the court. We'll overrule the objection. We'll allow him to use it. With the understanding that this is part of a statute, and I think that's the point the objection was making. May it please the court, as counsel has indicated and as the court has obviously grasped, we have two statutory provisions here, and we're calling upon you to interpret them. The lower court interpreted both of them in favor of the fund, which is the Horse Racing Equity Trust Fund, which is a separate fund in the Treasury, not one of your ordinary funds that is subject to day-to-day change and withdrawal by virtue of the governor's action. The governor is expressly prohibited from transferring from this fund. Anyway, if the court please. The monies deposited into the fund, plus any accrued interest on those monies, those monies being the monies paid by the owner licensees, the taxes, shall be distributed. The state says, let's interpret this statute as though it were a little different. Let's interpret it by putting in the words, while in the fund. So they say, it's plus any interest accrued while in the fund. We submit there are four reasons why this court should not interpret it in that fashion. First, the state that in interpreting a statute, you don't add additional words. The second objection is that if the legislature had meant to so restrict interest, it would have been very easy for them to do so. Somebody in Springfield probably could have figured out, gee, if we just add those words there, that will do it. Third, you interpret the statutes in the light of the purpose of the legislature. I don't think there is any question that the purpose of the legislature in this instance was to aid this ailing industry. This industry that was in serious trouble. They pass a law. They put the money into that fund automatically so it's not subject to annual appropriation or, as we've seen in other cases, lack of appropriation. It's automatic. They wanted to preserve the industry because it's not just a couple of people at the racetrack. It covers the whole state, the breeding of the animals, the farmers, all kinds of things. Fourth is as a matter of law the protest fund action was resolved against the casinos. Thus, the ownership of the money. The ownership of the money we're talking about was in the equity trust fund. As I'll expand a little bit later you have the state treasurer under the protest act being simply a stakeholder. This doesn't go into the general revenue fund under any circumstances. He's a stakeholder. A trustee, if you will. For whom is he a trustee? The answer is he's a trustee for the equity fund, which is to be distributed as we have just indicated. Let me ask you a question. Yes. The stance that you're talking about there. It says the money is deposited into the fund. Right. Now, let's suppose that the state had done what actually you wanted them to do to begin with. That is, they had paid the principal and interest. What would they do with that? Where would they put it? In the equity fund. The racing equity fund, right? Right. And wouldn't that glob of money be the money that's deposited into the fund? You can look at it from that point of view. I think if you ignore the background intention, why focus on money's deposited into the fund when you're talking about creation of the fund? You should be focusing on money's deposited in the sense of when did the licensees turn this money over? When does title pass? When does this fund become the owner of the money? Well, go ahead. And by virtue of people versus Roth, for example, the money once the court has decided the protest fund issue, title relates back so that the trust fund owned that money from day one. And we're talking about money's deposited into the fund. When it was deposited in the protest fund, I submit to you that as a matter of law, it was really deposited for the benefit of the title in the equity fund. Well, what do we do with the language of the Money Disposition Act that starts with, in cases involving temporary restraining orders and then it goes on to list a number of taxing bodies? You're talking about the Protest Act. May I ask you to hold that because I'm talking about the Horse Racing Act now. I don't want to get you off track with your argument. Okay, thank you. There's no question that the state invested this money, and there's no question that they earned money out of it. The question is, whose is it? So we're speaking of interest accrued on money's deposited into the fund. Accrued. You can only accrue money. You can only accrue interest before it goes into the equity trust fund there. What about interest on tardy payments? I don't think there would be any question that if a casino did not make their payment on time and were tardy, there would be interest. That interest would be earned technically before the money physically went into the fund, but can there be any doubt that that interest would follow when they pay their tax, plus the interest, that the interest accrued on that tax would go into the fund? I don't think there would be an issue about that. Now I would assume that the language is unambiguous. Even if it's ambiguous, that does not in any way detract from our argument. Because if it's ambiguous, what did the legislature intend? Did the legislature intend, when they drew this statute, to benefit racetracks? To take the funds that were coming in and to be used for that purpose? Or did they intend that the accidental waylaying, so to speak, of those funds should somehow throw money into the general revenue fund when they had expressly stated, we don't want this in the general revenue fund? I think it's a clear contradiction of the obvious intent of the legislature to proceed in that fashion. I'm not going to ask questions of ambiguity and interpretation. We can find a thousand cases all saying the same thing. And it also always comes down to how the court views the language. Now, turning to the other issue. The language is, any authorized payment from the protest fund shall bear simple interest from the date of deposit into the protest fund to the date of disbursement. And I'm going to come to your question in a minute. Can it be clearer? Let's just assume that that's all the statute said. Can it be clearer that that is what is meant? That the money from the date of deposit to the date of disbursement bears an interest? To win this argument, you only have to win on interpretation of one of these two statutes. Either one. Yes. Either one. And there's a third possible ground, too. But we'll come to that. Now, it says any authorized payment. Certainly, the order of the circuit court is an authorization. The rule is that when the legislature uses language that's clear, it's to be enforced as written. The state would like to add a few words to this language, which could be exemplified in many ways. And the simplest way to state it, consistent with their argument, is to place at the end of the language used the words, if the plaintiff is successful. The legislature added other words. The legislature went on beyond that. Yeah, but let's talk about the chronology. We have a statute that didn't say a word about interest. That's where we start. Then we come to Shell Oil. Shell Oil took a protest fund case involving, on the one hand, the county, on the other hand, the taxpayer. And the argument was made, it happened to be the taxpayer in that case, the argument was made by the taxpayer, I'm entitled to get interest back along with my money. And the court looked at the facts and said, the state invested this money, same as here, the state earned interest on this money. The state was a trustee holding that money. A trustee doesn't earn interest on the beneficiary's money. If he earns interest, if he invests it, it's got to be paid to the beneficiary. That's who we are. And then what happened is we have the amendment. Now, the amendment is quite clear. Can there be any question that under this language, the trust fund would be entitled to this money? They claim that the amendment doesn't say that. They claim, if I can find it. Well, if we accept your argument here, don't we have to agree that everything after this, this is superfluous? Well, since it came in a later amendment, what we have is a situation where you have a clear statute, and then following that, and following a case that specifically involved the municipality, the Pawnee case, the statute was amended. And it was amended to say that in these specific instances, if the state, if the ratepayer, the taxpayer loses, then the money goes to the municipality, county, what have you. But they wouldn't need that language, if that means what you said. They didn't need it. They didn't need the language. Have we ever seen a statute passed simply confirming the law rather than changing it? What they did was confirm it as to these particular agencies. And secondly, isn't it unusual to argue that an amendment makes what was prior a clear act, makes the prior act surplusage? I've never seen that. When we interpret an entire statute, you can say, okay, let's look at this and see if interpreting one way creates surplusage. And it may. But here you have a situation where you're talking about an amendment making the original statute surplusage. And I simply don't think that can happen. My last point that I would like to just make very briefly starts with the state's statement in their brief that they do not contend that their argument means to in any way affect the equitable powers of the court. They say on page 8 that the state defendants are not arguing that this provision eliminated any other non-statutory authority the courts may have to award interest. Puts us right back in shell oil. Because in shell oil, the court set equitable principles demand that where a trustee is holding money for somebody else and they earn money on it, they've got to pay it to that somebody else. That is exactly what we have here. And I respectfully ask that the court affirm the decision below, plus and this is a strange request in asking you to affirm it, remand it, because we have to get it back if you do affirm to have the lower court handle the ministerial task of determining how much interest there is. Thank you. Thank you, Counselor. Counselor, you can reply. May it please the court with respect to the final argument first. The only grounds asserted in the motions in the circuit court were statutory grounds. By arguing, by responding to their argument that the position we're taking eliminates all non-statutory authority for an award of interest doesn't mean that we are inviting them at oral argument to argue that there's a non-statutory basis for the award of interest that they want here. You can't change your theory even as aptly in the appellate court with something that's not been preserved in the circuit court and isn't preserved in the brief. They've argued statute, statute, statute. That's the issue before the court. I'm glad to address those, but I would say that it's both out of bounds and unwarranted to try and come up with some equitable theory here at the 12th hour. In addition, that argument has no merit because this is not like those cases they asserted to. This is not where the owner of the money from the get-go, the plaintiff taxpayer, got his money back and was entitled to interest if the state invested it and earned money on it. This money was not owned by the racetracks until it was distributed to them out of the horse racing fund. And the argument that Shell Oil would mandate a similar conclusion to this case is one that they didn't develop for very good reasons because the facts of that case are fundamentally different from the facts of this case. Let me then turn to their statutory arguments, which are the ones they presented to the circuit court and the circuit court relied upon. They said that the state is trying to add additional words to the statute. What they're saying is that these statutes could have been drafted more clearly and doing so would have used additional words. And that's just as true for their argument about the meaning of the 2006 Act, where they were essentially saying, well, don't pay too much attention to what the legislature said because their real purpose was, we're telling you, to get as much money to the racetracks as possible. That's not what the statute says. In fact, that nothing in that statute supports the conclusion that they were intended, that the legislature specifically intended that they would get extra money if that process were substantially delayed. And when you look at the language of the statute, and it's quoted, I think, at length in page A3 of the appendix to our brief, it points out that the only interest that could be paid to the racetracks is money that's in the horse racing fund itself already, which it stands to reason, because this is a segregated fund, is interest earned on principal that's already in the fund. That's what section B says, interest accrued on monies deposited into the fund. They're now trying to say that interest would be payable not from the fund someplace else, but into the fund from some undesignated location not administered by the racing board, and that the monies would not be accrued on interest deposited into the fund, but it would be interest accrued on money someplace else, and that the money would go not out of the fund, but into the fund. This is just rewriting a statute in a crazy-quill fashion that just can't be squared with the language of the statute that the legislature adopted. Now they're saying, oh, they would get interest on it, too. That's a total flip-flop. All through the merits litigation, they were busy saying to defend the constitutionality that these were public funds, not private funds, and all of a sudden, once they win that, they do an about-face and say, oh, it was really already our money all the time. That, I think, is inconsistent with the position that they took before. It's also not convincing. You had a question? Well, I was going to say, the appellee can generally argue any basis that's supported by the record to affirm, right? But judicial stop will put some limit on it. And when you argue a win on one point... Well, then you stop arguing. You don't say, by the way, Judge, there's ten other reasons I ought to win here before you rule my way, and that's kind of the reason that the appellee can continue to argue cases on appeal that he didn't argue below. And I fully accept... Those were public funds, which is what sustained their constitutionality in the merits litigation in the challenge to the 2006 Act. They were public funds. They weren't private funds. And so there's no need to even think about the arguments that they make that, oh, really, because they were private funds that somehow naturally were entitled to interest, even if the statutory language doesn't support it. How else are you going to win then? They talk about whether interest would be payable by a casino if they were tardy in making their deposit of the horse racing fund. That is inapposite. It has no relevance to the question here, which is whether the interest that the statute provides to be paid to the racetracks out of the horse racing fund, which is all that subsection A and subsection B provide, would accrue on money that's located in some other source. Again, I want to emphasize that the question before the court is not what the legislature would have done if it had contemplated the unusual situation presented by this case. There are not many statutes like this that I'm aware of. In fact, this is the only one in which you have a situation in which there's a state fund created, and then it's provided that the disposition of the proceeds in that fund would go to private parties. And then you have a Protest Monies Act that arises, and then it's ultimately resolved against the protesting plaintiff. The argument was made that this is an unusual situation in which we're claiming that the later amendment to the Protest Monies Act makes the earlier statute surplusage. No, that's not what we're saying. We're saying that the later amendment clarifies the original intent of the earlier amendment to the Protest Monies Act, which the legislative history confirms was intended to provide for the payment of interest to a prevailing plaintiff, not when the plaintiff loses. So, for those reasons, I urge the court to reverse the circuit court's judgment. I thank you kindly. Thank you, Your Honor. The court will take this case under adjournment.